[Civ. No. 13052. Third Dist. Aug. 23, 1971.]

THE PEOPLE, Petitioner, v.
THE SUPERIOR COURT OF SACRAMENTO COUNTY, Respondent;
JOHN FREDERICK BIGGS, Real Party in Interest.

524

## COUNSEL

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Daniel J. Kremer and Arnold O. Overoye, Deputy Attorneys General, for Petitioner.

No appearance for Respondent.

Michael S. Sands for Real Party in Interest.

## OPINION

**FRIEDMAN, Acting P. J.**—The People seek a writ of prohibition to restrain the superior court from dismissing a narcotics prosecution after the

court sustained the People's claim of privilege against harmful disclosure of official information in the files of the state Bureau of Narcotics Enforcement.

The facts will possess heightened significance against the backdrop of the governing statutes. Evidence Code section 1040 establishes a governmental privilege barring evidence of official information whose disclosure is against the public interest.[1] The privilege is conditional in the sense that the court must weigh the necessity for preserving the confidentiality of the information against the necessity for disclosure in the interest of justice. (See Witkin, Cal. Evidence (2d ed. 1966) §§ 865-867.) A procedure for judicial inquiry is supplied by Evidence Code section 915, subdivision (b), which provides for a hearing in the judge's chambers attended only by the judge and representatives of the public agency asserting the privilege.[2] In order to protect the interests of an accused person where the government's claim of privilege is sustained, Evidence Code section 1042, subdivision (a), directs the court to make an appropriate order adverse to the prosecution.[3]

[1]Evidence Code section 1040:

"(a) As used in this section, 'official information' means information acquired in confidence by a public employee in the course of his duty and not open, or officially disclosed, to the public prior to the time the claim of privilege is made.

"(b) A public entity has a privilege to refuse to disclose official information, and to prevent another from disclosing such information, if the privilege is claimed by a person authorized by the public entity to do so and:

"(1) Disclosure is forbidden by an act of the Congress of the United States or a statute of this state; or

"(2) Disclosure of the information is against the public interest because there is a necessity for preserving the confidentiality of the information that outweighs the necessity for disclosure in the interest of justice; but no privilege may be claimed under this paragraph if any person authorized to do so has consented that the information be disclosed in the proceeding. In determining whether disclosure of the information is against the public interest, the interest of the public entity as a party in the outcome of the proceeding may not be considered."

[2]Evidence Code section 915:

"(a) Subject to subdivision (b), the presiding officer may not require disclosure of information claimed to be privileged under this division in order to rule on the claim of privilege.

"(b) When a court is ruling on a claim of privilege under Article 9 (commencing with Section 1040) of Chapter 4 (official information and identity of informer) or under Section 1060 (trade secret) and is unable to do so without requiring disclosure of the information claimed to be privileged, the court may require the person from whom disclosure is sought or the person authorized to claim the privilege, or both, to disclose the information in chambers out of the presence and hearing of all persons except the person authorized to claim the privilege and such other persons as the person authorized to claim the privilege is willing to have present. If the judge determines that the information is privileged, neither he nor any other person may ever disclose, without the consent of a person authorized to permit disclosure, what was disclosed in the course of the proceedings in chambers."

[3]Evidence Code section 1042, subdivision (a):

"(a) Except where disclosure is forbidden by an act of the Congress of the United

Statutes which confirm citizens' right to inspect public records declare an express exception for records of investigations conducted by the office of the Attorney General and the Department of Justice. (Gov. Code, § 6254.) The Bureau of Narcotics Enforcement is a component of the Department of Justice under the overall direction of the Attorney General. (Gov. Code, §§ 15000-15001.)

John Biggs was about to go to trial, accused of having sold methedrine on December 5, 1970. Buyer of the methedrine was Stephen Clark, who had entered Biggs' home to make the purchase as an undercover operator for the Bureau of Narcotics Enforcement. Biggs himself was a parolee, having experienced a prior narcotics conviction. As revealed by later testimony, Biggs' defense would be twofold: first, that Lee Smith, who lived with Biggs, had actually sold the methedrine to Clark; second, that presence of the narcotics in Biggs' home and his awareness of Smith's activities was ascribable to the fact that Biggs himself was an active undercover operator for the Bureau of Narcotics Enforcement, accustomed to phoning in reports relative to Smith's visitors and customers.

With a view to proving Biggs' connection with the Bureau of Narcotics Enforcement at his coming trial, his attorney secured a subpoena duces tecum calling for production of certain records of the bureau. Although much broader originally, the request eventually narrowed down to the bureau's records of cases in which Biggs had supplied information to bureau agents which had been followed either by arrests or by investigations. These records, it appeared, took the form of notebooks and diaries in which agents kept daily records of their activities, including contacts with informers. The bureau invoked the privilege against harmful disclosure of official information (Evid. Code, § 1040, *supra*) and the prosecution moved to quash the subpoena. The case went to trial before a jury. Hearings on the state's motion to quash were sandwiched into recesses of the jury trial.

On the afternoon of the first day of trial the court conducted an *in camera* hearing under the provisions of section 915, subdivision (b). Other than the judge, the only persons present were three agents of the Bureau of Narcotics Enforcement and the deputy district attorney. Content of the hearing is unreported and unrecorded.

After the *in camera* hearing the prosecution supplied Biggs with some of the information demanded in the subpoena. Included in this information

States, if a claim of privilege under this article by the state or a public entity in this state is sustained in a criminal proceeding, the presiding officer shall make such order or finding of fact adverse to the public entity bringing the proceeding as is required by law upon any issue in the proceeding to which the privileged information is material."

was a statement that the bureau had paid Biggs $20 on June 1, 1970, and $20 on August 19, 1970. The bureau nevertheless maintained its claim of privilege as to any recorded communications from Biggs in his asserted role as an informer. The court sustained the claim of privilege.

Before the jury convened for the third day of the trial, the court ruled that if the prosecution insisted on its claim of privilege, it would order dismissal of the charge against Biggs. The court expressed the opinion that, as the testimony had unfolded, the information sought by Biggs was material and bore on the question of guilt or innocence. Later that day, in open court, the prosecution offered to supply the defense with those portions of the diaries and notebooks describing reports made by Biggs after masking out those portions of the records not pertaining to Biggs. Defense counsel did not accept the offer. The court did not push the matter, but stood by its nondisclosure ruling. The prosecution immediately applied to this court for a writ of prohibition to prevent the court from entering an order of dismissal. Upon receiving this court's stay order, the trial judge ordered the trial to continue. The case was submitted to the jury, which returned a guilty verdict. Since then and pending disposition of the prohibition proceeding in this court, the trial court has deferred sentencing Biggs.

California's new Evidence Code was adopted in 1965. The provisions in question (fns. 1, 2, 3, *supra*) represent an incomplete realization of concepts developed by antecedent case law. The development had its modern genesis in *United States* v. *Reynolds* (1953) 345 U.S. 1 [97 L.Ed. 727, 73 S.Ct. 528, 32 A.L.R.2d 382], a civil action in which the government, as defendant, had claimed a privilege against producing military aircraft secrets demanded by the plaintiffs. For our purposes the following points of the *Reynolds* decision seem salient: First, the government's claim of privilege is not conclusive; it is subject to judicial inquiry but without forcing public disclosure of the very material the privilege is designed to protect. Second, the litigant must make a showing of necessity which will determine how far the court will probe in satisfying itself that the government's claim of privilege is appropriate.[4] Third, the litigant's claim of necessity may be minimized if the government offers an "available alternative" which would permit the litigant to make out his case without forcing a showdown on the claim of privilege. Fourth is a dictum recognizing criminal cases which per-

[4] At this point the *Reynolds* opinion declares: "Where there is a strong showing of necessity, the claim of privilege should not be lightly accepted, but even the most compelling necessity cannot overcome the claim of privilege if the court is ultimately satisfied that military secrets are at stake. A fortiori, where necessity is dubious, a formal claim of privilege, made under the circumstances of this case, will have to prevail." (345 U.S. at p. 11 [97 L.Ed. at p. 735].)

mit the government to invoke its claim of privilege only at the price of letting the defendant go free.

Prior to adoption of the California Evidence Code, both federal and California decisions had established a criminal defendant's right to the production of meaningful evidence in the hands of the prosecution absent some overriding public interest.[5] The defendant could not indulge in a fishing expedition on the chance that something useful might turn up. Although he was not required to establish the information's admissibility as a precondition of disclosure, the decisions required some degree of specificity and a showing of "plausible justification."[6] Particular emphasis was placed upon the defendant's right to inspect any statement he himself had made to law enforcement officers.[7]

Decisional law called for dismissal of the criminal charge if the prosecution, moved by the government's need for confidentiality, elected to claim a privilege of nondisclosure.[8] Some decisions called for a nonstatutory, *in camera* hearing by the court for the purpose of preliminary inquiry into the merits of the government's claim of nondisclosure.[9] Others offered alternatives to the disclose-or-dismiss rule, proposing protective orders other than dismissal where the requested information was collateral to the central issue of guilt.[10]

Such was the background of court-made law against which the Evidence

---

[5]*Jencks* v. *United States* (1957) 353 U.S. 657, 666 [1 L.Ed.2d 1103, 1110, 77 S.Ct. 1007]; *Gordon* v. *United States* (1953) 344 U.S. 414, 418-419 [97 L.Ed. 447, 453, 73 S.Ct. 369]; *People* v. *Chapman* (1959) 52 Cal.2d 95, 98 [338 P.2d 428]; *People* v. *Riser* (1956) 47 Cal.2d 566, 585-586 [305 P.2d 1]. California developments in criminal discovery antedating the Evidence Code are discussed in Louisell, Modern California Discovery (1963) page 369 et seq.; Fletcher, *Pretrial Discovery in State Criminal Cases* (1960) 12 Stan.L.Rev. 293.

[6]*Ballard* v. *Superior Court* (1966) 64 Cal.2d 159, 167 [49 Cal.Rptr. 302, 410 P.2d 838, 18 A.L.R.3d 1416]; *People* v. *Cooper* (1960) 53 Cal.2d 755, 770 [3 Cal.Rptr. 148, 349 P.2d 964]; see also *Jencks* v. *United States, supra,* 353 U.S. at pages 666-667 [1 L.Ed.2d at pp. 1110-1111].

[7]*Cash* v. *Superior Court* (1959) 53 Cal.2d 72 [346 P.2d 407]; *People* v. *Cartier* (1959) 51 Cal.2d 590, 594 [335 P.2d 114]; Louisell, Modern California Discovery, *supra,* page 397; see Kaufman, *Criminal Discovery and Inspection of Defendant's Own Statements in the Federal Courts* (1957) 57 Col.L.Rev. 1113.

[8]*Jencks* v. *United States, supra,* 353 U.S. at page 672 [1 L.Ed.2d at page 1114]; *Roviaro* v. *United States* (1957) 353 U.S. 53, 60-61 [1 L.Ed.2d 639, 644-645, 77 S.Ct. 623]; *United States* v. *Reynolds, supra,* 345 U.S. at page 12 [97 L.Ed. at page 735]; *People* v. *McShann* (1958) 50 Cal.2d 802, 808-809 [330 P.2d 33].

[9]See cases cited 8 Wigmore on Evidence (McNaughton rev. 1961) section 2379, page 810, footnote 4; page 812, footnote 6.

[10]E.g., *Priestly* v. *Superior Court* (1958) 50 Cal.2d 812, 819 [330 P.2d 39]; *People* v. *Lopez* (1963) 60 Cal.2d 223, 247 [32 Cal.Rptr. 424, 384 P.2d 16].

Code provisions were drafted and enacted.[11] ■ In confirming a governmental privilege where the necessity for confidentiality "outweighs the necessity for disclosure in the interest of justice," section 1040 imposes a balancing process on the courts. It implicitly recognizes the point made in *Reynolds* (fn. 4, *ante*) that some kinds of governmental secrecy must be locked away from the most necessitous litigant. It does not explicitly require the litigant to establish the information's materiality, relevance or even admissibility. On the other hand, it does not license fishing trips. By calling for disclosure in the interest of justice, it compels the claimant to throw into the balance some showing of the "plausible justification" demanded by antecedent case law (e.g., *Ballard* v. *Superior Court, supra; People* v. *Cooper, supra*). In a criminal case the defendant must at least show how the information affects the preparation or presentation of his defense.

A government claim of privilege would be impregnable without some probing by a neutral tribunal. To surface appearances, Evidence Code section 915, subdivision (b), supplies the probing mechanism. To surface appearances it provides an *in camera* inquiry by the trial judge and the government, culminating in a ruling for or against disclosure. If the judge sustains the claim of privilege, he then transfers his attention to section 1042, subdivision (a), and enters such protective order "as is required by law."[12]

Viewed in these literal terms, section 915, subdivision (b), is apt to lure court and counsel into error. The *in camera* hearing is far too constricted to permit an enlightened determination. Shared only by the court and government, it provides no means for assessing the defendant's claim. It is paradoxical to hold a hearing for balancing the conflicting interests of two sides when only one is represented. Deprived of the three-way communication habitual to an adversary setting, the judge cannot simultaneously perform the tasks of inspecting and identifying the material, measuring the government's claim to withhold it and assessing the defendant's need to get it. The ex parte process places too much confidence in judicial prescience and invites error, even unfairness.[13]

---

[11]See comments of the Law Revision Commission and the Assembly Committee on Judiciary accompanying Evidence Code sections 915, 1040, 1042.

[12]The comments of the Assembly Committee on Judiciary accompanying the 1965 codification reveal that the last-quoted phrase was designed to incorporate decisional law imposing the disclose-or-dismiss alternative where the evidence is material to the issue of guilt (*People* v. *McShann, supra*) but permitting some other protective order where the privileged information bears upon some narrower issue. (*Priestly* v. *Superior Court, supra*.)

[13]In *Jencks* v. *United States, supra*, 353 U.S. at page 669 [1 L.Ed.2d at page 1112], the court stated flatly: "The practice of producing government documents to the trial judge for his determination of relevance and materiality without hearing the accused,

Evidence Code section 915, subdivision (b), withholds from court and counsel any invitation to explore and balance additional alternatives which might fulfill the defendant's needs and protect the government's interests. It leads to all-or-nothing rulings when better solutions might be available. It hinders the pruning out of material which the government wishes to seal and which is not really meaningful to the defense. It supplies no record of the proceedings in case the defendant, on appeal from an ultimate conviction, assails an unfavorable ruling.

The *in camera* hearing provided by section 915, subdivision (b), is adapted to no more than a preliminary inquiry. It offers the judge a guarded look into the government's secrets as a prelude to a more extended inquiry. Although it may furnish a fairly accurate measure of the government's claim, it supplies no more than a tentative, strictly provisional notion of the defendant's need. It does not place the court in readiness to rule on the claim of privilege. The court should continue its inquiry in an adversary setting, probing the information's relevance to the defense, exploring with counsel the availability of other alternatives and, if necessary, hearing testimony *voir dire*. Only at the conclusion of an adversary inquiry is the court in a position to assess the counter-balancing weight of the defendant's need, to appraise the possibility of reasonable alternatives and to determine what cost shall be exacted of the prosecution. Only at the conclusion of an adversary inquiry is the court qualified to rule for or against the government's claim of privilege.[14]

There should be no assumption that an *in camera* hearing under section 915, subdivision (b), is the only method of inquiring into the claim of privilege. Section 915, subdivision (b), is permissive. A wider inquiry is offered by other Evidence Code provisions, which authorize hearings outside the jury's presence for the purpose of determining preliminary or foundational

---

is disapproved." In later decisions the court indicated that *in camera* hearings are unsatisfactory not for lack of confidence in the integrity of the trial judge or government counsel, but because such a hearing is inadequate to safeguard the defendant's rights. (*Alderman* v. *United States* (1969) 394 U.S. 165, 182-184 [22 L.Ed.2d 176, 191-193, 89 S.Ct. 961]; *Taglianetti* v. *United States* (1969) 394 U.S. 316, 317 [22 L.Ed.2d 302, 304, 89 S.Ct. 1099]; see also *United States* v. *Alderisio* (1970) 424 F.2d 20, 23.)

[14]Contrast Evidence Code section 1042, subdivision (d), enacted in 1969, dealing with the parallel problem produced when the defense demands disclosure of the identity of an informer who is a material witness on the issue of guilt. Section 1042, subdivision (d), supplies more explicit procedural directions than section 915, subdivision (b), portraying the *in camera* inquiry as only one phase of a more extended, adversary hearing.

Contrast also, the Jencks Act, 18 United States Code section 3500, which permits the court to excise irrelevant matter from the demanded records; which, as the price of nondisclosure, permits striking the testimony of a witness as an alternative to declaration of a mistrial; which looks beyond the trial court level to the needs of appellate review. See also rule 16, Federal Rules of Criminal Procedure.

facts, including the existence or nonexistence of a privilege. (Evid. Code, §§ 400, 402, 405; see comment of Assembly Committee on Judiciary accompanying § 405.)

▮ In this case the state's claim of privilege was valid and weighty. The records in issue were the narcotics officers' notations of contacts with undercover informers. There is a recognized public interest in shielding the anonymity of narcotics informers. (*People* v. *McShann*, 50 Cal.2d at p. 806.) Although preservation of the informer's usefulness has been given as one reason, protection against physical harm is an additional impetus to secrecy. Thus the court was fully justified in its declaration of intention to sustain the claim of privilege.

The trial judge, nevertheless, was fully aware of the dilemma posed by literal pursuit of the *in camera* hearing procedure. Although indicating his belief that the records should not be disclosed, he expressed his distrust of any "unilateral determination" of materiality reached without participation by defense counsel. As the case unfolded and the judge heard more argument and evidence, he became convinced that the requested information was not only material but that it bore on Biggs' guilt or innocence.

In summary, both prosecution and defense witnesses agreed that during 1970 Biggs had supplied information to the Bureau of Narcotics Enforcement and had received several payments of money. The question was not whether the undercover connection existed but how close it was. In general, Biggs' testimony claimed close and constant communication in which, as a volunteer, he had furnished the names of many narcotics traffickers and had exposed a drug manufacturing laboratory. In general, the prosecution testimony tended toward the impression that the contacts had been infrequent, the connection thin and practically dead. Although the bureau agents testified to an official policy against using parolees as informers, they conceded to payments of money to Biggs. The latter's parole supervisor testified to awareness of his ward's undercover activities in October 1970, less than two months before the charged offense. The evidence permitted the inference that Biggs may have been a double-dealer, occasionally supplying information to the authorities and concurrently doing some peddling on his own. Stephen Clark, it was revealed, was facing criminal charges when, acting as an informer, he visited Biggs' home to make the "buy" of December 5.

▮ In weighing the defendant's need, the court was not to pass upon the veracity of his claim, but only to ascertain if a reasonable possibility existed that the requested information might exonerate him. (*Price* v. *Su-*

*perior Court* (1970) 1 Cal.3d 836, 843 [83 Cal.Rptr. 369, 463 P.2d 721].) The hard realities of narcotics law enforcement have produced a complex, shadowy network of ambiguous, half-formed and shifting relationships between the official agencies and their undercover informants. The competing versions of Biggs' connection with the enforcement authorities could not but mystify the jury. Lay jurors would be ill-prepared to comprehend the connections claimed by Biggs, let alone understand the motivations on each side. The prosecution evidence would show Biggs' involvement in narcotics traffic in and around his dwelling. The jury would use his involvement as a yardstick by which to measure his claim that Lee Smith, his housemate, had actually made the December 5 sale. Even in the face of that claim, Biggs could lawfully maintain the defense of entrapment by the enforcement authorities. (*People* v. *Perez* (1965) 62 Cal.2d 769, 776 [44 Cal.Rptr. 326, 401 P.2d 934].) Further, a statutory immunity was available to him, could he but convince the jury that he had been working under immediate direction of the authorities.[15] ■ Official records of his reports to the Bureau of Narcotics Enforcement would supply acutely needed corroboration of his oral testimony. The trial court correctly concluded that the required records were reasonably necessary to the defense; that they bore on the issue of guilt or innocence; that their nondisclosure would deprive the accused of a fair trial; that the state's continued insistence on nondisclosure would compel dismissal of the charge. (Evid. Code, § 1042, subd. (a); *Price* v. *Superior Court, supra,* 1 Cal.3d at pp. 842-843; *Honore* v. *Superior Court* (1969) 70 Cal.2d 162, 167-168 [74 Cal.Rptr. 233, 449 P.2d 169]; *People* v. *McShann, supra,* 50 Cal.2d at p. 808.)

The state, in fact, dropped its insistence. ■ As indicated earlier, the prosecution offered to supply the defense with the narcotics agents' diaries and notebooks after masking out all entries unrelated to Biggs. Further, the prosecutor offered to submit the notebooks and diaries to the trial judge for the latter's assurance that entries relating to Biggs had not been masked out. Propriety of the trial court's dismissal order cannot be weighed without consideration of the prosecution counteroffer.

The prosecution offer embraced the very information the defense assertedly needed. Biggs' attorney should have accepted it. He did not. The trial court should have ascertained whether the offer reasonably fulfilled the defendant's needs and, if it did, should have forced the defense to accept the

---

[15]Health and Safety Code section 11710: "All duly authorized peace officers, while investigating violations of this division in performance of their official duties, and any person working under their immediate direction, supervision or instruction, are immune from prosecution under this division."

offer on pain of an adverse ruling. The court did not do so. At this point error occurred. It was traceable not to intrinsic error in the court's earlier ruling of nondisclosure, but rather to the ruling's prematurity.

In clothing the court with authority to balance the necessity for confidentiality against the necessity for disclosure in the "interest of justice," Evidence Code section 1040 vests the court with discretion. That discretion requires consideration of alternative evidence offered by the state. An alternative which fulfills the demanding litigant's actual needs minimizes or eliminates necessity for fulfilling the original demand and avoids a showdown on the claim of privilege. (*United States* v. *Reynolds, supra,* 345 U.S. at p. 11 [97 L.Ed. at p. 735].) Biggs would have been adequately protected by the trial judge's identification of the particular entries affecting him and excision or masking of unrelated entries. (*Taglianetti* v. *United States, supra,* 394 U.S. at p. 317 [22 L.Ed.2d at p. 304]; *In re Waltreus* (1965) 62 Cal.2d 218, 223 [42 Cal.Rptr. 9, 397 P.2d 1001].) "Here the defendant was entitled to see [his own recorded communications] and nothing else. He had no right to rummage in government files." (*Taglianetti* v. *United States, supra,* 394 U.S. at p. 317 [22 L.Ed.2d at p. 304].)

The ruling on Biggs' disclosure request should have been withheld pending inquiry into a possible middle ground. ■ The court should have ruled after and not before the state's counteroffer. The dismissal order was proposed by the court without consideration of the counteroffer. For that reason the dismissal order would exceed the power reposed in the court by Evidence Code section 1042, subdivision (a), and transcend its jurisdiction in the sense that the order is susceptible to prevention or correction by an extraordinary writ. (*Abelleira* v. *Superior Court* (1941) 17 Cal.2d 280, 291 [109 P.2d 942, 132 A.L.R. 715]; 1 Witkin, Cal. Procedure (2d ed. 1966) p. 706.)

Biggs, as real party in interest, challenges issuance of a writ of prohibition at the prosecution's behest. He points to the absence of any statute permitting a prosecution appeal from a dismissal order under Evidence Code section 1042, subdivision (a). ■ Generally, the state may appeal from a dismissal order only when the defendant has not been placed in jeopardy or when he has waived jeopardy. (Pen. Code, § 1238, subd. (a) (8).) ■ Biggs had been placed in jeopardy when the jury was impaneled and sworn. (*Curry* v. *Superior Court* (1970) 2 Cal.3d 707, 712-714 [87 Cal.Rptr. 361, 470 P.2d 345].)

Availability of extraordinary relief at the prosecution's behest is governed by *People* v. *Superior Court (Howard)* (1968) 69 Cal.2d 491 [72 Cal.Rptr. 330, 446 P.2d 138]. Since a trial court exceeds its defined powers when it orders unauthorized dismissal of a criminal prosecution, several earlier

decisions had sanctioned extraordinary relief as a means of halting post-trial dismissals. In *People* v. *Superior Court, supra,* the Supreme Court established tight restrictions upon prosecution writ applications, overruling these earlier decisions. It hardened the general rule which prevents the prosecution from utilizing writ proceedings to gain appellate review after trial where statutes supply no direct appeal. It left open a single exception for cases of unusual importance where the defendant would not be exposed to the danger of further trial or retrial. (69 Cal.2d at p. 501.)

Were it not for the restriction imposed by *People* v. *Superior Court* (*Howard*), *supra,* several considerations would support the writ of prohibition sought here. The threatened dismissal would exceed the trial court's power. Were we to restrain the dismissal, judgment would be pronounced upon the verdict of guilt. The defendant would then have available a motion for new trial and an appeal in which substantial questions could be raised. One way or another, Biggs has not had the benefit of the disclosure rules. His case was submitted to the jury without the defense benefits conceivably to be found in the state's records. In part, court and counsel were misled by the draftsmanship of Evidence Code section 915, subdivision (b), which creates the erroneous impression that a ruling for or against privileges should be made at the close of the court's *in camera* inquiry. Further, in the haste and pressure of the proceedings, the trial court was not adequately supplied with the case law concepts underlying the Evidence Code provisions. Finally, although no deliberate dilatoriness appears, the inquiry was propelled into haste by the concurrent progress of the jury trial.

A writ of prohibition followed by a successful new trial motion or a successful appeal would not expose the prosecution to the defense of former jeopardy. On the assumption that reversible error has occurred, a retrial would permit both sides to pursue the disclosure problem with more insight than attended their original efforts. Thus a writ of prohibition would serve to initiate a series of steps fully protective of the prosecution interests without jeopardizing the accused's ultimate ability to defend himself.

Nevertheless, as we view *People* v. *Superior Court* (*Howard*), *supra,* the absence of a statutory prosecution appeal expresses a legislative policy against exposing the accused to a possible retrial, even though the policy transmutes an erroneous trial court ruling into an erroneous dismissal. This court is without power to issue the writ of prohibition because the writ would expose the accused to a possible retrial. (*People* v. *Superior Court* (*Howard*), *supra.*)

The People's application for a writ of prohibtion is denied. The order

to show cause is discharged and the stay order issued by this court is dissolved.

Bray J.,* concurred.

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.